IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**WILD HORSE OBSERVERS
ASSOCIATION,** *et al.*

        Plaintiffs,

        vs.                No. 1:11-CV-00335-MCA-RHS

**KEN SALAZAR, Secretary of the U.S.
Department of the Interior,** *et al.*

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *Federal Defendants' Motion to Dismiss and Memorandum of Points and Authorities in Support Thereof* [Doc. 15] and the parties' court-ordered supplemental briefs. [See Docs. 34, 36, 37, 38, 39, 40, 42, 44]  Having considered the submissions, the relevant case law, and otherwise being fully advised in the premises, the Court grants the Federal Defendants' motion.

## I.    PROCEDURAL HISTORY AND BACKGROUND

Plaintiff Wild Horse Observers Association (WHOA) is a public nonprofit corporation, the mission of which is "to protect and preserve the wild horses and their habitat in the area of Placitas, New Mexico and in all of New Mexico."  [Doc. 4 at 2]  The members of WHOA "observe, study, and aesthetically enjoy the wild horses of New Mexico" and "recreate in and around areas that the wild horses roam–searching for them, photographing them and watching them in their family groups."  [Doc. 4 at 2]  Plaintiffs

Patience O'Dowd, Sandy Johnson, Chuck Johnson, Kevin Quail, Adelina Sosa, Judith

Chase, and Diane Ransom, are members of WHOA. [Doc. 4 at 2-3]

On May 18, 2011 Plaintiffs filed an *Amended Petition for Preliminary Injunction,*

*Declaratory Judgment, and Permanent Injunction* against, *inter alia*, the Secretary of the

United States Department of the Interior Ken Salazar and the Director of the United

States Bureau of Land Management (BLM) Bob Abby (hereinafter referred to

collectively as the "Federal Defendants"). [Doc. 4]  Plaintiffs' *Amended Petition* alleges

that "[t]here are approximately 100 unbranded and unclaimed horses on United States

public lands in the area near and around Placitas, New Mexico," which the Federal

Defendants have failed to inventory and protect in violation of the Wild Free-Roaming

Horses and Burros Act, 16 U.S.C. § 1331, *et seq.* (hereinafter referred to as "the Wild

Horses Act").  [Doc. 4 at 6]  The *Amended Petition* seeks relief under the Administrative

Procedure Act (APA), 5 U.S.C. §§ 702, 706(1), for the Federal Defendants' failure "to

take a discrete agency action that it is required to take–to designate the Placitas horses as

wild, and to manage and protect them as components of the public lands, in a manner that

is designed to achieve and maintain a thriving natural ecological balance on public lands."

[Doc. 4 at 12]  The relief requested is a preliminary and permanent injunction "ordering

that the Defendant not remove the wild horses from the area in and around Placitas, New

Mexico without following the dictates of the [Wild Horses Act]," as well as a declaratory

judgment "declaring that Defendant BLM is required to implement the [Wild Horses Act]

with respect to the wild horses in the area of Placitas, New Mexico." [Doc. 4 at 12-13]

On August 3, 2011, the Federal Defendants filed the *Federal Defendants' Motion to Dismiss and Memorandum of Points and Authorities in Support Thereof* [Doc. 15]. The Federal Defendants argued that the *Amended Petition* should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) because "Plaintiffs lack standing, their claims are time-barred, and they fail to satisfy the APA's jurisdictional requirement of challenging a 'final agency action' or a discrete 'failure to act.'"  [Doc. 15 at 13]  Plaintiffs responded that the *Amended Petition* alleges a discrete "failure to act" under the APA "in that Federal Defendants have conducted no inventory to determine the status of the horses in the Placitas area as required by law." [Doc. 23 at 3]  As such, Plaintiffs argued that they have standing under the APA, their claims are not time-barred, and the *Amended Petition* states a claim upon which relief can be granted.

On January 24, 2012, the Court entered an *Order for Simultaneous Supplemental Briefing* [Doc. 34] on the following issues: (1) "Does the 1979 Management Framework Plan, which accepted the recommendation of the Unit Resource Analysis for the Rio Grande Planning Unit regarding wild horses, constitute a final agency action under the APA regarding the existence of wild horses in the Placitas area?"; and (2) "Does the Federal Defendants' alleged failure to act in violation of 5 U.S.C. § 706(1) of the APA constitute a continuing violation for the purposes of the six-year statute of limitations in 28 U.S.C. § 2401?". [Doc. 34 at 2-3] The parties filed their respective simultaneous supplemental briefs on February 6, 2012 [see Docs. 36 and 37] and their responsive briefs on February 16, 2012. [See Docs. 42 and 44]  The supplemental briefing is complete and

3

the *Federal Defendants' Motion to Dismiss and Memorandum of Points and Authorities in Support Thereof* [Doc. 15] is now ripe for decision.

## II.   STANDARD OF REVIEW

The Federal Defendants have moved to dismiss Plaintiffs' *Amended Petition* pursuant to Fed. R. Civ. P. 12(b)(1), which allows for the dismissal of a claim for lack of subject matter jurisdiction.[1]  Fed. R. Civ. P. 12(b)(1).  Generally, Rule 12(b)(1) motions to dismiss for lack of jurisdiction will come in the form of (1) a facial attack, in which case the movant merely challenges the sufficiency of the complaint, requiring the district court to accept the allegations in the complaint as true, or (2) a factual attack, where the movant goes beyond the allegations in the complaint and challenges the facts upon which subject matter jurisdiction depends.  Paper, Allied-Industrial, Chemical And Energy Workers Intern. Union v. Continental Carbon Co., 428 F.3d 1285, 1292 (10th Cir. 2005). Here, the Federal Defendant have launched a factual attack, meaning this Court "must look beyond the complaint and has wide discretion to allow documentary and even testimonial evidence. . . ."  Id.  Reference to evidence outside the pleadings does not convert the motion to dismiss into a motion for summary judgment; instead, only when resolution of the jurisdictional question is intertwined with the merits of the case is it necessary to convert a Rule 12(b)(1) motion into a Rule 56 motion.  Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995).

─────────────────

[1]Because the jurisdictional analysis under Fed. R. Civ. P. 12(b)(1) is dispositive of the Federal Defendants' motion, the Court need reach the Federal Defendants' alternative argument under Fed. R. Civ. P. 12(b)(6).

## III.    HISTORICAL CONTEXT AND DISCUSSION

> Wild horses and burros are the progeny of animals introduced to North America by early Spanish explorers.  They once roamed the western rangelands in vast herds.  But over time, desirable grazing land was fenced off for private use, while the animals were slaughtered for sport and profit. The herds began to dwindle, and the remaining animals were driven to marginal, inhospitable grazing areas.  Alarmed at decline of these herds, Congress in 1971 enacted the [Wild Horses Act] . . .

Mountain States Legal Found. v. Hodel, 799 F.2d 1423, 1425 (10th Cir. 1986).  In the

Wild Horses Act, Congress found and declared that

> wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene.  It is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands.

§ 1331.  The term "wild free-roaming horses and burros" is defined as "all unbranded and

unclaimed horses and burros on public lands of the United States."  § 1332(b).  The

parties agree that the Wild Horses Act only protects horses that were wild, unbranded,

and unclaimed in a particular area in 1971 and their descendants. [See Doc. 23 at 2; see

also 43 C.F.R. § 4700.0-5(d) (defining a herd management area as "the geographic area

identified as having been used by a herd as its habitat in 1971")].  The Wild Horses Act

directs the Secretary of the Interior and the Secretary of Agriculture "to protect and

manage wild free-roaming horses and burros as components of the public lands" and to

"designate and maintain specific ranges on public lands as sanctuaries for their protection

and preservation." § 1333(a).  The Secretaries must "manage wild free-roaming horses

and burros in a manner that is designed to achieve and maintain a thriving natural

ecological balance on the public lands."  Id.  To achieve this end, the Secretaries are

required to "maintain a current inventory of wild free-roaming horses and burros on given

areas of the public lands." § 1333(b)(1).  The purpose

> of such inventory shall be to: make determinations as to whether action
> should be taken to remove excess animals; determine appropriate
> management levels of wild free-roaming horses and burros on these areas of
> the public lands; and determine whether appropriate management levels
> should be achieved by the removal or destruction of excess animals, or
> other options (such as sterilization, or natural controls on population levels).

Id.

A.    *Standing*

     "In every federal case, the party bringing the suit must establish standing to

prosecute the action."  Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004).

> To show that he has Article III standing, a plaintiff must demonstrate three
> elements: injury in fact, traceability, and redressability. To demonstrate an
> injury in fact, a plaintiff must show he has suffered an invasion of a legally
> protected interest which is (a) concrete and particularized, and (b) actual or
> imminent, not conjectural or hypothetical. The element of traceability
> requires the plaintiff to show that the defendant is responsible for the injury,
> rather than some other party not before the court. Finally, the requirement
> of redressability ensures that the injury can likely be ameliorated by a
> favorable decision.

S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation and Enforcement,

620 F.3d 1227, 1233 (10th Cir. 2010) (internal quotation marks and citations omitted).

     "The burden to establish standing rests on the party invoking federal jurisdiction,

6

and the evidence needed to carry that burden depends on the stage of litigation." Essence, Inc. v. City of Federal Heights, 285 F.3d 1272, 1280 (10th Cir. 2002). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice . . . ." Infant Swimming Research, Inc. v. Faegre & Benson, LLP, 335 Fed. Appx. 707, 713 (10th Cir. 2009) (unpublished opinion) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)). "If, however, the defendant files a motion to dismiss for lack of jurisdiction, thus putting the plaintiff's Article III standing in issue, a district court may conduct limited discovery on the jurisdictional issue and resolve the matter on motion supported by affidavits, or, if a genuine issue of material fact exists, may conduct an evidentiary hearing." Id.

When a complaint seeks prospective relief,

the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future. Past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury. The threatened injury must be "certainly impending" and not merely speculative. A claimed injury that is contingent upon speculation or conjecture is beyond the bounds of a federal court's jurisdiction.

Tandy v. City of Wichita, 380 F.3d 1277, 1283-84 (10th Cir. 2004) (internal quotation marks and citations omitted). "Standing must be analyzed from the facts as they existed at the time the complaint was filed." Id. at 1284.

The Federal Defendants contend that Plaintiffs lack standing to seek prospective injunctive relief because they are not suffering a continuing injury and are not under a real and immediate threat of being injured in the future. [Doc. 15 at 13] Specifically, the

Federal Defendants contend that "except for misinformed speculation about the prospect of removal, the complaint lacks concrete allegations supporting the inference that the BLM has any current plan to remove the horses." [Doc. 15 at 13]  Plaintiffs respond that the Federal Defendants' failure to protect the Placitas horses under the Wild Horses Act constitutes an injury-in-fact, traceable to the Federal Defendants and redressable by the requested relief.  [Doc. 23 at 16-17]

As a preliminary matter, this Court recognizes that Plaintiffs' aesthetic interest in the Placitas horses "is undeniably a cognizable interest for the purpose of standing," S. Utah Wilderness Alliance, 620 F.3d at 1233 (quoting Lujan, 504 U.S. at 562-63), and it is precisely the type of interest that the Wild Horses Act seeks to protect.  See § 1331 (providing that wild horses are "living symbols of the historic and pioneer spirit of the West; they contribute to the diversity of life forms within the Nation and enrich the lives of the American people"); see also National Credit Union Admin. v. First Nat. Bank & Trust Co., 522 U.S. 479, 488 (1998) (holding that the plaintiff's injury must arguably fall within the zone of interests that the statute seeks to protect).  Plaintiffs need not plead and prove that the Federal Defendants intend to round up and remove the Placitas horses in order to prevail on their Amended Petition.  Rather, Plaintiffs' aesthetic interest in observing, studying, and recreating among the Placitas horses may be harmed if the horses are indeed wild, as alleged in the Amended Petition, and the Federal Defendants failed to inventory and protect the Placitas horses in accordance with the requirements of the Wild Horses Act.  See Biodiversity Legal Found. v. Badgley, 309 F.3d 1166, 1172

(9th Cir. 2002) ("Appellants' interests face specific and concrete injury because the Service's failure to list the Spalding's Catchfly, the Great Basin Redband Trout, the southern population of the Mountain Yellow–Legged Frog, and the Yellow–Billed Cuckoo will result in continued threats to their existence." (citation omitted)); Animal Legal Defense Fund, Inc. v. Glickman, 154 F.3d 426 (D.C. Cir. 1998) (holding that the plaintiff, who enjoyed observing animals under humane conditions, had standing to challenge regulations promulgated under the Animal Welfare Act). Stated another way, the real and immediate threat to the Placitas horses posed by the Federal Defendants' alleged failure to inventory, protect, and "manage wild free-roaming horses and burros as components of the public lands" and to "designate and maintain specific ranges on public lands as sanctuaries for their protection and preservation," § 1333(a), is sufficient to support the issuance of declaratory and injunctive relief. Accordingly, the Court concludes that Plaintiffs have standing to pursue their claims.[2]

B.      APA

The Wild Horses Act does not provide for a private right of action and, therefore, the *Amended Petition* seeks relief under the APA. Review under the APA is limited to final agency actions. See 5 U.S.C. § 704 ("Agency action made reviewable by statute and

---

[2]WHOA also has associational standing on behalf of its members. See S. Utah Wilderness Alliance, 620 F.3d at 1234 n.4 ("An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 181 (2000)).

final agency action for which there is no other adequate remedy in a court are subject to judicial review.").  "[T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury . . . ."  Darby v. Cisneros, 509 U.S. 137, 144 (1993) (internal quotation marks and citation omitted).

> As a general matter, two conditions must be satisfied for agency action to be final:  First, the action must mark the consummation of the agency's decisionmaking process, -it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow . . .

Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citations omitted).  "The finality of an agency action is jurisdictional and thus may be raised at any time."  Cherry v. United States Dep't of Agriculture, 13 Fed. Appx. 886, 890 (10th Cir. 2001) (citations omitted) (unpublished opinion).

The term "final agency action" includes an agency's failure "to take a *discrete* agency action that it is *required to take*."  Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 64 (2004); see 5 U.S.C. § 706(1) ("The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed").  "The limitation to *discrete* agency action precludes . . . broad programmatic attack[s]."  Id.  (emphasis added).

> The limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law (which includes, of course, agency regulations that have the force of law). Thus, when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be.

Id. at 65; see id. at 66 (holding that 43 U.S.C. § 1782(c), which requires the BLM to

preserve the wilderness in certain areas, is "mandatory as to the object to be achieved, but

it leaves BLM a great deal of discretion in deciding how to achieve it.  It assuredly does

not mandate, with the clarity necessary to support judicial action under § 706(1), the total

exclusion of [off-road vehicle] use.").

A six-year statute of limitations in 28 U.S.C. § 2401 applies to suits under the

APA.  Chemical Weapons Working Group, Inc. (CWWG) v. United States Dep't of the

Army, 111 F.3d 1485, 1494 (10th Cir. 1997); see § 2401(a) ("Except as provided by

chapter 71 of title 41, every civil action commenced against the United States shall be

barred unless the complaint is filed within six years after the right of action first

accrues.").  Thus, an APA claim must be filed within six years of the final agency action

being challenged.  See id.  "This statute of limitations, upon which the government's

waiver of sovereign immunity is conditioned, is jurisdictional."  Cherry, 13 Fed. Appx. at

891.

*1.*      *Discrete and Required Agency Action*

Section 1333(b) of the Wild Horses Act provides as follows:

The Secretary shall maintain a current inventory of wild free-roaming
horses and burros on given areas of the public lands.  The purpose of such
inventory shall be to: make determinations as to whether and where an
overpopulation exists and whether action should be taken to remove excess
animals; determine appropriate management levels of wild free-roaming
horses and burros on these areas of the public lands; and determine whether
appropriate management levels should be achieved by the removal or
destruction of excess animals, or other options (such as sterilization, or
natural controls on population levels).

§ 1333(b).  This provision plainly requires the Federal Defendants to "maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands."  Id. Although the manner and time period for the completion of the inventory is left to the Federal Defendants' discretion, the statute nonetheless imposes a discrete nondiscretionary duty to conduct such an inventory in order to facilitate the administration of the Wild Horses Act.  Because the *Amended Petition* alleges that the Federal Defendants failed to inventory the Placitas area for wild horses in violation of Section 1333(b), the Court concludes that it challenges discrete nondiscretionary agency action.

The Federal Defendants contend, however, that they are not "legally required" to fulfill their discrete nondiscretionary inventory duty because Section "1333(b) neither requires a particular process to perform an initial inventory nor mandates when such an inventory must be complete." [Doc. 36 at 10-11]  However, in Forest Guardians v. Babbitt, 174 F.3d 1178, 1190 (10th Cir. 1999), the Tenth Circuit Court of Appeals recognized that agency action may be "unreasonably delayed" under Section 706(1), even though Congress has not imposed a statutory deadline for completion.  Indeed, "the distinction between agency action 'unlawfully withheld' and 'unreasonably delayed' turns on whether Congress imposed a date-certain deadline on agency action."  Id. "[W]hen an agency is required to act–either by organic statute or by the APA–within an expeditious, prompt, or reasonable time, § 706 leaves in the courts the discretion to decide whether agency delay is unreasonable."  Id.  "Once a court deems agency delay

unreasonable, it must compel agency action." Id. at 1191.  The Wild Horses Act was

enacted in 1971.  There is no contention that a forty-year delay in completing a discrete

nondiscretionary duty to inventory public lands for wild horses would be reasonable.[3]

Accordingly, the Court concludes that agency action unreasonably delayed for forty years

under Section 1333(b) may be compelled under Section 706(1).

2.      _Statute of Limitations_

The Federal Defendants next contend that Plaintiffs' APA claim is barred by the

six-year statute of limitations in Section 2401(a), because the 1979 Management

Framework Plan (MFP) for the Rio Grande Planning Unit, which includes the Village of

Placitas, constitutes a final agency determination that no wild horses exist in Placitas.

Alternatively, they contend that Plaintiffs' failure-to-act claim is barred by the six-year

statute of limitations because Plaintiffs claim accrued in 1979, when they knew or should

---

[3]To determine whether agency delay is unreasonable, most courts consider "[t]he six factors the District of Columbia recognized in Telecommunications Research Action Ctr. v. FCC, 750 F.2d 70, 80 (D.C. Cir. 1984) ["TRAC"]."  Forest Guardians, 174 F.3d at 1191 n.18.  These factors are as follows:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.' "

TRAC, 750 F.2d at 80.

have known that the Placitas area would not be managed for wild horses.

*i.*       *Final Agency Action*

It is undisputed that the 1979 MFP is silent with respect to the Placitas horses; it neither mentions whether an inventory of the Placitas area was conducted nor whether any wild horses were found therein.[4]  The parties argue for competing inferences from this silence.  The Federal Defendants contend that it may be inferred that an inventory of the Placitas area was conducted, but that no wild horses were found and therefore, the Placitas area would not be managed for wild horses.  [Doc. 36 at 4]  Plaintiffs respond that this silence "shows the obvious–that Federal Defendants failed to consider whether the horses in existence in the Placitas area at the time of the enactment of the Free-Roaming and Wild Horse and Burro Act of 1971 were wild or not." [Doc. 37 at 3]

The Court has reviewed the 1979 MFP, which is exhaustive, spanning five books and approximately two thousand pages. [See CD lodged by the Federal Defendants] After reviewing these materials, the Court is unable to reasonably ascertain whether the Placitas area was inventoried for wild horses or whether a final determination was made regarding the existence and management of wild horses in the Placitas area. Given this ambiguity and uncertainty, the Court assumes, without deciding, that the 1979 MFP does

---

[4]The 1979 MFP contains a comprehensive and thorough discussion of a small wild horse herd found in the northern portion of the Rio Grande Planning Unit "immediately south of the Colorado border and west of the Rio Grande Gorge." [Doc. 15-3, Ex. G at 2]  The 1979 MFP recommends the removal of this herd because "[t]he size of the present herd will keep it from ever being a truely [sic] producive [sic] herd." [CD: Ex. J at 225]  It is undisputed that the Placitas horses are not a part of this wild horse herd.

not constitute final agency action regarding the Placitas horses.

ii.      *Failure to Act*

Proceeding on the assumption that the Federal Defendants failed to inventory the Placitas area for wild horses in violation of the Wild Horses Act, the Court next addresses whether Plaintiffs' failure-to-act claim is barred by the six-year statute of limitations in Section 2401(a).  To resolve this issue, the Court requested supplemental briefing on the continuing violations doctrine, which "permits a plaintiff to sue on a claim that would be time-barred if considered in isolation, but where subsequent violations act to prevent accrual or otherwise toll the limitations period."  Wild Fish Conservancy v. Salazar, 688 F. Supp. 2d 1225, 1234 (E.D. Wash. 2010).  "The federal circuits are split as to whether plaintiffs in suits alleging agency noncompliance with statutory deadlines may be able to avoid the statute of limitations by application of the continuing violations doctrine."  Id. This issue has not been directly addressed by our Tenth Circuit Court of Appeals.

Wilderness Soc'y v. Norton, 434 F.3d 584, 588-89 (D.C. Cir. 2006) is representative of those cases that apply the continuing violations doctrine to failure-to-act claims under Section 706(1) of the APA.  In that case, the plaintiff filed suit in the United States District Court for the District of Columbia, alleging that the National Park Service (NPS) had "failed to meet its statutory deadline to perform wilderness reviews or file and complete legal boundary maps."  Id. at 588.  The NPS argued that the plaintiff's suit was "untimely, because each claim was brought more than six years after NPS failed to meet its statutory deadline."  Id.  Although the United States Court of Appeals for the District

15

of Columbia Circuit did not need to address this issue because it found that the plaintiff

lacked standing to pursue its claim, the Court nonetheless noted that the plaintiff "appears

to be right in its contention that the District Court erred in dismissing the counts under the

Wilderness Act and the specific enabling statutes as time-barred under 28 U.S.C. §

2401(a)." Id.  The Court explained that it had "repeatedly refused to hold that actions

seeking relief under 5 U.S.C. § 706(1) to 'compel agency action unlawfully withheld or

unreasonably delayed' are time-barred if initiated more than six years after an agency

fails to meet a statutory deadline." Id. (citing In re United Mine Workers of America

International Union, 190 F.3d 545 (D.C. Cir. 1999)).  The Court noted that the plaintiff's

complaint had alleged "continuing violations by the Government" and "'does not

complain about what the agency has done but rather about what the agency has yet to

do.'" Id. at 589 (quoting United Mine Workers, 190 F.3d at 549).  Under these

circumstances, the Court held that it was "unlikely that [plaintiff's] complaint would be

held by this court to be time-barred by 28 U.S.C. § 2401(a)."[5]  Id.

---

[5]The Federal Defendants point out that the foregoing analysis in Wilderness Society
constitutes dicta and is of questionable precedential value.  See West Virginia Highlands
Conservancy v. Johnson, 540 F.Supp.2d 125, 140-43 (D. D.C. 2008) (declining to follow the
Court of Appeals' dicta in Wilderness Society and holding that the continuing violations doctrine
does not apply to failure-to-act claims under Section 706(1)).  However, Wilderness Society
remains good law and is representative of those cases that apply the continuing violations
doctrine to failure-to-act claims under Section 706(1).  In reaching the same conclusion, the
Eastern District of Virginia reasoned as follows:

> Plaintiffs § 706(1) claim of unreasonable or unlawful delay is not time-barred,
> however, since application of a statute of limitations to a claim of unreasonable
> delay is grossly inappropriate, in that it would mean that EPA could immunize its
> allegedly unreasonable delay from judicial review simply by extending the delay
> for six years.  EPA's delay is better understood as a continuing violation, which

However, the vast weight of authority holds that the continuing violations doctrine does not apply to failure-to-act claims under Section 706(1).  For example, in Center for Biological Diversity v. Hamilton, 453 F.3d 1331, 1333 (11th Cir. 2006) (per curiam), the Eleventh Circuit Court of Appeals rejected the plaintiff's claim that "the failure of the Secretary of the Department of the Interior to perform the nondiscretionary duty to designate a critical habitat for a threatened species is a continuing violation that permits a plaintiff to file suit more than six years after the deadline to perform the duty has passed." After examining the text of the Endangered Species Act, the Court held that the Act does not impose an ongoing duty, but rather, "a single violation that accrues on the day following the deadline."  Id. at 1335.  The Court explained that this interpretation is consistent with prior precedent that limits the scope of the continuing violations doctrine to "continuing violations," rather than "the continuing effects of a discrete violation."  Id. Additionally, the continuing violations doctrine is limited "to situations in which a reasonably prudent plaintiff would have been unable to determine that a violation had occurred."  Id.  Finally, the Court noted that its "conclusion that the continuing violation doctrine does not apply is also consistent with our statute of limitations and sovereign immunity jurisprudence."  Id.  Section 2401 "unambiguously imposes a six-year statute of limitations" and the Court's refusal to apply the continuing violations doctrine "comports

---

plaintiff's may challenge at any time provided the delay continues.

American Canoe Ass'n, Inc. v. United States Envtl. Prot. Agency, 30 F. Supp. 2d 908, 925 (E.D. Va. 1998) (citation omitted).

with principles of sovereign immunity." Id. at 1335-36.

Likewise, most other Courts have rejected the application of the continuing violations doctrine to agency inaction, reasoning that a contrary conclusion would result in a "*de facto* elimination of any statute of limitation" because the "limitation period would never begin to accrue" so long as the agency failed to act.  Wild Fish Conservancy, 668 F. Supp. 2d at 1236; see also Izaak Walton League of Am., Inc. v. Kimbell, 558 F.3d 751, 758-62 (8th Cir. 2009) (holding that the continuing violations doctrine did not apply to the Forest Service's alleged failure to implement motorboat quotas under the Boundary Waters Canoe Area Wilderness (BWCAW) Act and that the plaintiffs' claim accrued when the Forest Service published regulations indicating that the area in question fell outside of the BWCAW boundary); Preminger v. Sec'y of Veterans Affairs, 517 F.3d 1299, 1306-08 (Fed. Cir. 2008) (holding that the continuing violations doctrine did not apply to the plaintiff's challenge to an agency's failure to subject a regulation to the notice and comment rulemaking process and that the plaintiff's claim accrued when the regulation was finalized; noting that "were we to accept the plaintiff's continuing violation theory, there effectively would be no statute of limitations because the injury would always be ongoing").  Rather, these Courts hold that the statute of limitations begins to run when "the plaintiff either knew, or in the exercise of reasonable diligence should have known, that [he or she] had a claim."  Izaak Walton League of Am., Inc., 558 F.3d at 759 (internal quotation marks and citation omitted).

With these two lines of authority in mind, the Court turns to Tenth Circuit case law

18

regarding agency inaction and the continuing violations doctrine.  In Ute Distrib. Corp. v. Sec'y of the Interior of the United States, 584 F.3d 1275, 1282 (10th Cir. 2009), the Tenth Circuit Court of Appeals noted that a claim against the United States first accrues under Section 2401(a) "when all events have occurred which fix the liability of the Government and entitle the claimant to institute an action."  Id. (quoting Izaak Walton League of Am., Inc., 558 F.3d at 759).  In Ute Distrib. Corp., the plaintiff challenged the Secretary of the Interior's implementation of the 1954 Ute Partition and Termination Act, 25 U.S.C. §§ 677 et seq., claiming that it "did not provide for equitable and practicable division of water rights between the 'mixed-blood' and 'full-blood' members of the Ute Indian Tribe."  Id. at 1276.  The plaintiff argued that the 1995 action was timely filed under Section 2401(a) "because the Secretary had, and continues to have, a continuing duty to properly manage any undistributed assets, including what [the plaintiff] claims were the undistributed water rights and water rights claims."  Id. at 1282.  The Court rejected this argument, noting in relevant part that "the continuing wrong doctrine cannot be employed where the plaintiffs's injury is definite and discoverable and nothing prevented plaintiff from coming forward to seek redress."  Id. at 1283 (internal quotation marks and citation omitted).  The Court held that the Secretary's approval of the plan of division was a single discrete event associated with the UPA that gave rise to a cause of action and triggered the limitations period.  "As a result, the mixed-bloods knew or should have known that any claims asserting improper division of those assets would need to be filed within six years of the date of the Secretary's approval of the Plan of Division."  Id.

Additionally, "numerous events have occurred since the time of the Secretary's approval that establish [the plaintiffs] either knew or should have known of the claim it originally sought to assert in this action." Id.  In particular, in March of 1969 an entity "closely aligned" with the plaintiffs had filed an action in the United States Court of Claims "on behalf of the mixed-bloods . . . alleging a claim similar, if not identical, to the one now asserted by [the plaintiffs]." Id.  Under these circumstances, the Court concluded that the plaintiffs claim was time-barred.

As Ute Distrib. Corp. reflects, "[t]he continuing violation doctrine is premised on the equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated.  Thus, a continuing violation claim will likely fail if the plaintiff knew, or through the exercise of reasonable diligence would have known" of the existence of his or her claim." Evans v. Dean Foods Co., 29 F.3d 1163 (Table), 2000 WL 1260493, at *2 (10th Cir. 2000) (internal quotation marks and citation omitted) (unpublished opinion).  The continuing violations doctrine "is triggered by continual unlawful acts, not by continual ill effects from the original violation." Mata v. Anderson, 635 F.3d 1250, 1251 (10th Cir. 2011) (internal quotation marks and citation omitted); see also Brock v. Herbert, 435 Fed.Appx. 759, 763 (10th Cir. 2011) ("The doctrine does not allow a plaintiff to challenge discrete acts of wrongful conduct which occurred outside of the statute of limitations.") (unpublished opinion).  To hold otherwise would mean that the statute of limitations, in practical effect, would never begin to run until the agency acted. Cf. Bergman v. United

States, 751 F.2d 314, 316-17 (10th Cir. 1985) (rejecting the plaintiff's challenge to errors in his employment records under the Privacy Act because the plaintiff knew or should have known of these errors prior to the expiration of the statute of limitations; to hold otherwise "would, in practical effect, meant that the two-year statute would never run").

Applying these principles to the facts of the present case, the Court concludes that Plaintiffs' injury was discrete and discoverable and that nothing prevented Plaintiffs from coming forward to seek redress.  At some point following the enactment of the Wild Horses Act in 1971, Plaintiffs should have realized that the Placitas area had not been inventoried for wild horses and was not being managed in accordance with the dictates of the Wild Horses Act.  There are various points in time at which Plaintiffs arguably were on notice of the existence of their claim:  (1) in 1979, when the MFP failed to mention the existence of wild horses in the Placitas area; (2) in 1986, when the superceding Resource Management Plan and Record of Decision failed to mention the existence of wild horses in the Placitas area; (3) in 1992, when a second superceding Resource Management Plan and Record of Decision failed to mention the existence of wild horses in the Placitas area. [CD exhibits, I and J] See Izaak Walton League of Am., Inc., 558 F.3d at 758-62 (holding that the plaintiff knew or should have known that the Forest Service and had failed to implement motorboat quotas under the Boundary Waters Canoe Area Wilderness (BWCAW) when the Forest Service published regulations indicating that the area in question fell outside of the BWCAW boundary); Preminger, 517 F.3d at 1306-08 (holding that the plaintiff knew or should have known that a challenged regulation had

21

not been subjected to the notice and comment rulemaking process when the regulation was finalized); West Virginia Highlands Conservancy v. Johnson, 540 F.Supp.2d 125, 139 (D. D.C. 2008) (holding that the plaintiff knew or should have known that the EPA had failed to study coal mining waste after the expiration of the statutory deadline or the publication of the Hard Rock Mining Report, which failed to mention coal mining waste).

The Court need not pinpoint the exact time at which Plaintiffs should have reasonably known of the existence of their claim, because the record **affirmatively reflects** that Plaintiffs had actual knowledge of their claim as early as 2002.  In support of their supplemental brief, Plaintiffs attached the September 2002 minutes from "The Two Hundred Sixty-Third Session of the New Mexico Livestock Board." [Doc. 40 at 13] Patience O'Dowd and Wilda Portner of the WHOA were present, as was Tom Gow of the BLM.  [Id.] At the meeting, the New Mexico Livestock Board (Board) addressed the alleged wild horses in the Placitas area.  Plaintiff O'Dowd informed the Board that "in [the WHOA's] opinion these are wild horses."  "She said that WHOA would like a memorandum of understanding between WHOA and [the Board] which would place the Placitas horses in the same category as the White Sands Missile Range wild horses.  Mrs. O'Dowd and Ms. Portner said that WHOA intends to acquire a preserve for these horses." [Id. at 14] In response, Mr. Jimmie Hall, Vice-Chairman of the Board, stated that "these horses do not fall in the wild horses act and any changes to the law require legislative action.  Ms. O'Dowd said that she believed these horses were there before 1971."  Mr. Gow "presented the BLM's role in this situation" as follows:

22

He reviewed the Wild Horse and Burro Act of 1971. He said that BLM conducted an inventory of horses and that there are two units of wild horses in New Mexico that are under BLM's jurisdiction, one in Socorro and one on the Jicarilla reservation. He said that the wild horses were in Placitas before 1971 but were owned by the Reservation and there was a commune near Placitas that was involved. When the commune was disbanned the horses were turned loose. He said that the BLM believes that the San Felipe Reservation owns these horses.

[Id.]

Because Plaintiffs had actual knowledge nine years prior to the filing of this lawsuit that the alleged wild horses in the Placitas area were not being protected and managed under the Wild Horses Act, the Court concludes that their claim is time-barred under Section 2401(a).

Finally, Plaintiffs contend that they "have been affirmatively misled by Federal Defendants about the existence of a final agency action which disabled them from bringing an action with regard to such action." [Doc. 37 at 18] Specifically, Plaintiffs contend that they "have only recently learned that the repeated representations of the BLM [regarding tribal ownership of the Placitas horses] are unsubstantiated. The statute of limitations cannot start to run while Plaintiffs did not have the information about BLM's claims of Indian ownership." [Doc. 44 at 10] Although not characterized as such, Plaintiffs' contentions implicate the doctrine of equitable tolling.

"Federal Courts have tolled the commencement of a limitations period on a claim against the United States in two circumstances: (1) when the United States concealed its wrongdoing so the plaintiff did not know and in the exercise of due diligence could not

learn of his injury; and (2) when the plaintiff's injury was 'inherently unknowable.'"

Urbazo v. United States, No. 91-6028, 1991 WL 213406, at *4 (10th Cir. Oct. 21, 1991)

(unpublished opinion); see also Strich v. United States, 793 F.Supp.2d 1238, 1245 (D.

Colo. 2011) (holding that "the jurisdictional nature of a statute of limitations does not

necessarily preclude tolling for equitable considerations. Consistent with this, other

courts, including the Tenth Circuit, have considered on the merits whether jurisdictional

limitations should be equitably tolled.").  Equitable tolling, however, "is not available to a

tardy plaintiff who, notwithstanding the alleged concealment, had actual []or constructive

knowledge of the facts constituting his claim for relief."  Thomas v. Secretary of the

Army, No. 96-6182, 1997 WL 2458, at * 1 (10th Cir. Jan. 2, 1997) (internal quotation

marks and citation omitted) (unpublished opinion); see Urbazo, 1991 WL 213406, at * 4

(rejecting the plaintiff's claim against the Bureau of Indian Affairs because the plaintiff

knew of his injury prior to the expiration of the statute of limitations).  In this case,

notwithstanding the Federal Defendants' statements regarding Indian ownership of the

Placitas horses, the record reflects that Plaintiffs were aware in 2002 of the alleged fact

that the Placitas horses were "wild," that they "were there before 1971," and that they

were allegedly protected by the Wild Horses Act.  [Doc. 40 at 14]  Because the Federal

Defendants' alleged misrepresentations did not prevent Plaintiffs from having actual

knowledge of the facts constituting their claim for relief, the Court rejects Plaintiffs'

equitable tolling claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiffs' APA claim is barred

by the six-year statute of limitations in Section 2401(a).

**IT IS THEREFORE ORDERED** that *Federal Defendants' Motion to Dismiss*

*and Memorandum of Points and Authorities in Support Thereof* [Doc. 15] is **GRANTED**.

**SO ORDERED** this 28th day of September, 2012, in Albuquerque, New Mexico.

M. CHRISTINA ARMIJO
United States District Judge